## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| ALICE JOURNET *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-04-4730 |
| | § | |
| VEHICLE VIN NO. | § | |
| 1GRAA06283T500670, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

This is a products liability case involving an automobile collision with an eighteen-wheel truck's tractor-trailer.  Plaintiffs Alice Journet, Howard Journet, and Deandrick Fields, individually and as representatives of the estate of Barranthia Journet and as guardian of Dalyah Mone and Deijah Corinne Journet Fields, sued various defendants, alleging defective design, manufacture, and marketing of the trailer.  Plaintiffs specifically allege that defendants are liable because the trailer did not have a side underride guard protector or elevation added that, according to plaintiffs, would have prevented the smaller vehicle from "submarining" under the trailer, with catastrophic consequences for the vehicle's occupants. (Docket Entry Nos. 1, 3, 38).

The parties have had numerous discovery disputes.  After the defendants agreed to amend the scheduling order on multiple occasions, the plaintiffs continued to seek extensions.  Most recently—and after all but one of plaintiff's experts provided reports and

were deposed—the plaintiffs have attempted to expand the basis for one of their liability theories.  Specifically, the plaintiffs notified defense counsel that they intend to conduct crash tests using a Great Dane trailer of the type involved in the accident, modified to include a side underride guard device designed and produced under the direction of one of plaintiffs' expert witnesses.  The plaintiffs did not propose this crash testing until after they had designated their experts, submitted expert reports, and defendants had already deposed these experts, in accordance with the extended scheduling order.

Defendants object to this attempt to change the basis for the experts' contention that a side guard would have avoided the fatality in the collision at issue and that the guard's absence made the trailer defective.  (Docket Entry Nos. 131, 137, 139).  Defendants in essence ask this court to exclude the results of such crash testing from evidence in this case because it comes after the discovery into the experts' opinions is virtually concluded.  Plaintiffs respond that the defendants would not be prejudiced by the additional proposed crash tests.  Recognizing, somewhat inconsistently, that defense counsel would need to redepose at least some of the plaintiffs' experts after the additional crash tests, plaintiffs' counsel offered to pay reasonable costs for additional discovery.  (Docket Entry Nos. 134, 136).

This court held a hearing and ordered plaintiffs to provide support for their contention that their experts gave advance notice of their intent to conduct crash tests on a trailer modified to include a side underride guard device.  This court also ordered defendants to provide support for their contention that they would be prejudiced by the additional tests,

2

even given the plaintiffs' offer to pay reasonable additional costs of necessary additional discovery.  The parties complied.  (Docket Entry Nos. 137–39).  Reviewing the motion and response, the applicable law, and the record, this court grants the defendants' motion.  The reasons are stated below.

## I.  Background

The accident at issue occurred in December 2002.  Plaintiffs filed this suit on December 16, 2004.  (Docket Entry No. 1).  On February 15, 2005, the parties filed their Joint Discovery/Case Management Plan with this court, stating that the plaintiffs would designate experts and file expert reports on September 1, 2005 and that discovery would close on February 6, 2006, with dispositive motions to be filed by February 6, 2006 and docket call to be held on April 3, 2006.  (Docket Entry No. 6).  This court entered a substantially similar Scheduling and Docket Control Order on February 18, 2006.  (Docket Entry No. 9).  The Scheduling Order required plaintiffs to designate experts and submit expert reports no later than September 2, 2005 and all parties to end discovery by January 20, 2006.  (*Id.*).

On November 10, 2005, the parties filed an agreement under Local Rule 83.5[1] to extend certain deadlines.  (Docket Entry No. 69).  The parties agreed to extend the plaintiffs' deadline for designating experts and submitting expert reports to January 5, 2006.  Plaintiffs

---

[1]  "Agreements among the parties are enforceable by the Court only if they are announced in open court or reduced to writing and signed.  Nevertheless, agreements of the parties are not binding on the Court."  LOCAL R. 83.5.

agreed to "make all of their retained experts available for deposition by December 19, 2005." (*Id.* at 2). Defendants' responsive expert designations and reports would be due February 13, 2006, and the defendants' experts would be available for depositions by February 27, 2006. The discovery cutoff date remained set for January 20, 2006.

On January 3, 2006, the parties agreed to extend the discovery closing date approximately one month, to February 24, 2006. (Docket Entry No. 71). This filing specifically stated that it "does not change in any way the expert deadlines as agreed to in our November 10, 2005 letter agreement." (*Id.* at 2). This court approved this agreement and entered an Amended Scheduling Order. (Docket Entry No. 72).

In their January 5, 2006 filing, the plaintiffs designated nineteen experts, providing a paragraph about the general nature of the testimony each expert would provide. (Docket Entry No. 73). Plaintiffs did not file their expert reports with the court. On January 6, 2006, plaintiffs filed a Motion to Supplement the report of one of their designated experts, Anthony Sances. (Docket Entry No. 74). Defendants objected on the ground that the plaintiffs' experts had had ample time to complete their work, noting that the defendants had already agreed to extend the expert report deadline in November 2005. (Docket Entry No. 76). Shortly thereafter, the plaintiffs moved to quash seventeen depositions that the defendants had noticed. (Docket Entry Nos. 76–93). In January 2006, the defendants moved to quash ten depositions that the plaintiffs had noticed. (Docket Entry No. 97). This court held a hearing on these disputes. (Docket Entry No. 98).

4

At the January 19, 2006 hearing, in response to defendants' complaint that several of plaintiffs' experts had neither completed their reports nor given deposition dates, plaintiffs' counsel stated that one expert, Dr. Sances, needed to conduct certain crash tests before he could complete his expert report and be deposed.  (Docket Entry No. 120 at 4, 5, 7, 28).  This court permitted the plaintiffs an additional extension of time to conduct these crash tests and required the plaintiffs to produce reports and supporting materials from their experts in compliance with Rule 26 before the experts were deposed.  (*Id.* at 31, 35, 38).  This court specifically required the plaintiffs to produce complete expert reports and the material on which the experts relied in forming their opinions before the depositions:

> The Court:            . . . [The defense is] entitled to know what tests [the expert conducted] and to be given copies of these tests.
>
> Plaintiff's Counsel: I agree, Your Honor.  And Your Honor, I foresee that there would be a volume of materials that would be produced per expert, and that would be produced at the depositions ——
>
> The Court:            No, no, no, no, it's not going to be produced at the depositions.
>
> Plaintiff's Counsel: I'm immediately coming to the statement that it will be produced immediately.
>
> The Court:             . . . . we need to get a timetable for producing that information and for revising the reports if that is going to be required; then a series of dates for the depositions to occur no less than, what, two weeks after the production of the information?

(Docket Entry No. 120 at 30).  Throughout the January 19, 2006 hearing, this court emphasized the requirement that the plaintiffs' experts include in their reports their opinions

5

and the reasons therefor, any exhibits to be used as a summary of or in support of the opinions, and the materials and information on which the experts relied in formulating these opinions, *before* the defendants deposed the plaintiffs' experts. (*See, e.g.*, Docket Entry No. 120 at 35 ("They've got to—if [Plaintiffs' counsel] intends to have the option available of using him [the expert] at all, [the expert has] got to be designated and a proper report given and you [defense counsel] then would have an opportunity to depose him.")). This court asked the parties to agree on dates complying with these requirements:

> The Court: Why don't [the attorneys] go to the jury room now and see if you can work out some of the report issues and see if you can also set a time—put specific dates that would be consistent with the timetable that we talked about, two to three weeks between producing reports and producing—and underlying materials and setting the first deposition and then two to three weeks to take the depositions and then working off of that when you want to start having your people ready to designate and be deposed. Once we have those dates, then we can work out the rest of the schedule.

(Docket Entry No. 120 at 38). The parties complied. On the basis of the dates to which plaintiffs agreed, this court filed an Amended Scheduling and Docket Control Order. (Docket Entry No. 103).

The Amended Scheduling and Docket Control Order filed on January 20, 2005 allowed the plaintiffs to provide expert reports and related documents in compliance with Rule 26 no later than February 10, 2006. The defendants were to depose the plaintiffs' experts from February 27, 2006 until March 17, 2006. The defendants' expert designation deadline would be April 17, 2006, with depositions to be scheduled from May 1, 2006

through May 15, 2006.  Defendants' *Daubert* motions and motions for summary judgment were to be filed by June 30, 2006 with plaintiffs' response due July 21, 2006 and defendants' reply due July 28, 2006.  Docket call was set for January 26, 2007.  (Docket Entry No. 103).

Plaintiffs filed an amended designation of experts on February 13, 2006.  (Docket Entry No. 106).  Defendants deposed engineer Steven A. Schlosser on February 28, 2006, accident reconstructionist Douglas N. Head on March 6, 2006, accident reconstructionist Bruce Enz on March 7, 2006, and biomechanist Anthony Sances, Jr. on March 21, 2006.

Steven Schlosser brought an animated design of a side underride guard to his deposition.  (*See, e.g.*, Docket Entry No. 137, unnumbered Ex. 7 at 68).  He explained that the design was "just a graphical representation of another guard" (*id.* at 75) and that "it's an animation.  It's not a real thing." (*Id.* at 73).  Schlosser limited his testimony to the animated designs he brought to the deposition.  He testified that he was "not aware" of any crash testing and repeatedly stated that his animated model was an "approximation" that could not actually be tested.  He did not base his opinions on any actual crash test of a trailer equipped with a side underride guard.

Douglas Head testified that he had never designed, built, or tested a side underride guard.  (Docket Entry No. 137, unnumbered Ex. 6 at 13).  Head testified that he would not be offering any testimony at trial about "crash tests of vehicles into the sides of trailers," because "that is something Mr. Enz will testify to." (*Id.* at 14).  Later in the deposition, Head reiterated that, "in this case, I will not be offering an opinion as to the structural adequacy or function of underride guards." (*Id.* at 91).

At his deposition, Enz testified that he had not yet conducted any crash tests for this case.  (Docket Entry No. 137, unnumbered Ex. 1 at 14).  He stated that he had "contacted a company about crashing two Berettas, and that may have been done.  I have not heard back from them yet."  (*Id.* at 15).  Enz testified that he had contacted the crash-test company, Karco, "sometime" in the week before his deposition.  (*Id.*).  He testified that he asked Karco "to crash two Berettas at approximately 45-degree trailer angle at approximately 35 miles per hour."  (*Id.*).  Enz wanted the company to have one of the crashes make contact with the tractor-trailer wheels, and to have the second crash avoid the wheels.  (*Id.* at 17).  The purpose of the tests was to determine the impact and speeds involved in the accident.  (*Id.* at 10–17).  Enz made no mention of a third set of crash tests for any other purpose, such as testing a side underride guard.

When questioned about possible alternative designs of trailers with side underride guards, Enz described several general principles and design concepts that he would recommend.  (*Id.* at 198–201).  Enz then mentioned the need for crash tests of such a device as part of the design and retrofit analysis.  When defense counsel asked him specifically, "How many of these crash tests would you think would need to be run?" (*id.* at 202), Enz responded, "I haven't really thought that through, how many crash tests.  It depends on the kind of outcome of your first barrage.  You'd want to at least do a series that would do a minimum, I would think, of 3 in 10 angle increments.  So, you'd be looking at about 27 crashes at a minimum. . . ."  (*Id.* at 202).  Enz did not testify about any specific new side

underride guard design and had not done the work necessary to produce such a design himself.

At Sances's deposition, defense counsel questioned him specifically about crash testing.  Sances stated that he had conferred with Enz about crash tests.  (Docket Entry No. 137, unnumbered Ex. 2 at 30).  When asked to tell defense counsel "the full extent of those discussions so that I know all of what has been considered in the way of crash tests," Sances responded, "I guess he's [Enz's] planning to do a crash test.  I don't know.  If we feel that a dummy would be helpful, I'll put a dummy in an instrument."  (*Id.*).  When asked what Sances's "understanding of the types of crash tests that are being considered," Sances replied, "I don't know.  I'm going to leave that up to him [Enz]."  (*Id.*).  When given another opportunity to explain any details about the crash testing, Sances replied, "I don't know.  I leave that up to [Enz].  [Enz]'s the accident reconstructionist."  (*Id.*).  Defense counsel again asked if Sances could tell him "anything else about your discussions with Mr. Enz regarding crash tests," Sances stated, "No.  That's it.  He said he was trying to design a crash test but I'll leave that up to him.  Whatever he decides.  That's his area.  I'm a biomechanic.  I can put a dummy in and measure whatever we need to if it's necessary."  (*Id.*).  As noted, Enz had only planned two crash tests, none with a trailer modified to include a side underride guard, to verify the impact speed.

Crash testing also came up at John Tomassoni's deposition.  (Docket Entry No. 137, unnumbered Ex. 4).  Tomassoni confined his testimony about side underride guards to existing studies, including previously done crash tests.  He referred to a study conducted by

9

NHTSA, a study on a German-designed Krone guard, and data and analysis from a previous similar lawsuit, referred to as the "D'Orazio guard."[2]  Tomassoni did not testify that he had an intent or believed there was a need to conduct a crash test with a side guard added to a Great Dane trailer in the present case.  He merely testified that he "thought that it might be a good idea to at least kick around the idea of having Enz do some side underride tests representing this particular accident case using the vehicle in question and possibly a trailer in question.  And then maybe equipping that trailer with a side guard."  (Docket Entry No. 138, unnumbered Ex. 3 at 63–64).  The testimony was clear that when his report was written and his deposition was given, Tomassoni had formulated his opinions without crash testing a Great Dane trailer of the type involved in this case, modified to include a side underride guard, and he had no plan to conduct or rely on such a test.

On April 13, 2006, the parties filed a Local Rule 83.5 Agreement to amend the scheduling order to permit plaintiffs' expert Steve Irwin to produce materials and to be deposed by May 8, 2006; requiring plaintiffs to produce all files, documents, and information relating to Enz's two proposed crash tests—limited to verifying impact and speed not involving any side underride guard on a Great Dane trailer—by May 1, 2006; and for the defendants to make their experts available for depositions from June 12, 2006 through June

---

[2]  According to the defendants, Tomassoni brought some of the proposed safer alternative design models he had developed as an expert in this other case with him to the deposition.  (Docket Entry No. 139 at 9).  None of these models included the guard designed and produced by Enz that the plaintiffs now intend to crash test.

28, 2006.  The parties extended the deadline for the defendants' *Daubert* and summary judgment motions to August 1, 2006.  (Docket Entry No. 121).

On April 27, 2006, the plaintiffs requested a fourteen-day extension to conduct the crash tests.  (Docket Entry No. 123).  Defendants objected, arguing that this court's January 19, 2006 hearing and the Amended Scheduling Order entered after that hearing allowed the plaintiffs additional time (beyond what the defendants had already agreed to give plaintiffs without this court's involvement, both before and after the January 2006 hearing), and that plaintiffs had nevertheless failed to conduct the crash tests within the deadlines.  (Docket Entry No. 125).

On May 2, 2006, this court held a hearing on the plaintiffs' motion.  Plaintiffs' counsel explained that the crash tests had again been delayed.  (Docket Entry No. 128 at 2–4).  Defendants objected to the continued delays.  Defendants informed this court of the fact that Sances, the plaintiffs' biomechanics expert who, according to plaintiffs' counsel had required more time to produce his report because he could not do so without first conducting new crash tests, had testified at his deposition that he did not need to rely on new crash tests to reach the opinions he gave in his report and deposition and did not intend to rely on new crash testing.  Instead, it was Enz who intended to conduct crash tests in this case.  (*Id.* at 6). This court expressed great concern over having crash testing done after the expert depositions had already been taken.  (*Id.* at 10–13).  Plaintiffs' counsel stated that the crash testing Enz proposed to do would merely "confirm" what the experts had already opined in their reports and testimony.  (*Id.* at 13).  After hearing plaintiffs' counsel refer to existing

11

crash tests, defendants asked for clarification about whether any crash tests plaintiffs proposed to do would involve a trailer modified to include a side underride guard device. (*Id.* at 14).  This exchange followed:

> Defense counsel:    It is my understanding from Mr. Enz's [deposition] testimony that he was going to run two crash tests at 45-degree angles and to the sides of the trailers without any guards.  So, what we've heard today for the first time is that there's contemplated testing of a guard.

> The Court:    I don't understand that.  I thought that the guards were a reference to tests that have been done by NHTSA[,] not the tests that were contemplated for any of the plaintiffs' experts in this case; is that correct?

> Plaintiffs' counsel:  That is correct.

(Docket Entry No. 128 at 17).  Based on the understanding that the crash tests were limited to two tests, without any side guards, this court allowed a further extension of plaintiffs' expert deadlines; required the plaintiffs to produce a written protocol for the two crash tests; allowed defendants and their experts to be present at the tests and videotape them; and permitted the defendants to redepose Sances and Enz, the two plaintiffs' experts who claimed to have wanted the crash testing done, limited to the specific crash tests which were for a limited purpose.  The new date for the testing to be completed was June 30, by agreement of the parties.

In accordance with this ruling, this court again issued an Amended Scheduling Order, requiring the plaintiffs to produce a written protocol for crash testing by May 12, 2006; the parties to exchange agreed dates for testing by June 3, 2006; the plaintiffs to provide

supplemental expert reports by August 14, 2006; and the defendants to provide expert reports by September 22, 2006.  (Docket Entry No. 127).  This court also established a *Daubert* and summary judgment motion schedule beginning with a motion deadline for the defendants on November 17, 2006 and concluding with a hearing on the motions on January 12, 2007. (*Id.*).

On May 16, 2006, the defendants filed a motion to enforce this court's ruling on the crash tests. (Docket Entry No. 131).  Defendants argued that, notwithstanding the deposition testimony and plaintiffs' counsel's statements to the court, plaintiffs now intended to conduct *three* crash tests.  The first two tests were as Enz testified in his deposition: plaintiffs would do two tests crashing a Beretta into a Great Dane trailer to verify the collision speed of the accident.  The third test, however, would involve crashing a Beretta into a Great Dane trailer modified with a side underride guard designed and produced by Enz.  Defendants objected to this apparent change in the plaintiffs' plans, all of which occurred after defendants had already deposed plaintiffs' expert witnesses, and asked for an order precluding this additional testing as evidence in this case.  Defendants contend that none of the plaintiffs' expert reports or disclosures indicate an intent to conduct crash tests using a Great Dane trailer modified with side guards.  (*Id.* at 1).

This court held a hearing on the motion, (Docket Entry No. 136), and requested additional information from the parties.  This court asked the plaintiffs to submit affidavits from their experts about the timetable of the development of a side underride guard designed in this case and the plan to crash test a Great Dane trailer modified to include this guard.  In

13

his affidavit, Enz testified that since the plaintiffs retained him in August 2005, he and John Tomassoni "have discussed the type of side underride guard that would be desired on various trailers including the Great Dane trailer involved in this case." (Docket Entry No. 138 at 2). Tomassoni apparently had been involved in another case involving a Great Dane trailer, and Enz wanted to use that information.  In his affidavit, Enz stated:

> [In t]he prior Great Dane case in which Mr. Tomassoni participated, there was actual crash test data that was created relating to side underride guards. However, under the terms of the settlement agreement between Great Dane and Plaintiffs [sic] attorney, Mr. Tobias, Mr. Tomassoni was not at liberty to access and/or use any of that crash test data.  Mr. Hall, Plaintiffs [sic] counsel in this case, was advised of these complications and informed me that he would obtain this crash data through discovery in this case.  Such earlier crash data and testing would have alleviated many of the needs that are presently being confronted in this case regarding side underride crash testing of a Great Dane trailer.   After a considerable amount of time, it ultimately became evident that prior Great Dane side underride guard crash test results would not be forthcoming and more earnest discussions between Mr. Tomassoni and I were undertaken concerning our own crash testing protocol including the installation of a SURG [side underride guard] in such testing.

(Docket Entry No. 138 at 3).  Defendants respond that the settlement agreement placed no such limitation on the plaintiffs' information.  Defendants point out that they in fact produced part of that information in their initial disclosures in this case.  (Docket Entry No. 139 at 8). Moreover, according to the defendants, Tomassoni brought some of these very drawings and data with him for his deposition in this case.  (*Id.* at 9).  The records submitted by the defendants with their reply brief support this position.  (*See* Docket Entry No. 139, Ex. 4 from Tomassoni Dep.).

With respect to the side underride guard that Enz apparently designed for use in this case, Enz testified as follows:

> At least, by the early part of 2006 (January or February) [plaintiffs' counsel] and I discussed the actual assembly and production of a side underride guard that would be adaptable to the specific trailer that was involved in the accident in question. On February 8, 2006, I obtained photographs and measurements of similar Great Dane trailer undercarriages for use in this case. I also began the exercise of locating and purchasing a Great Dane trailer in order to install a side underride guard that would match the trailer involved in this litigation.

> At the time of my deposition in March 2006, I advised counsel of our plans to crash at least two (2) vehicles in the side of a Great Dane trailer.  The principle reason for these two (2) crashes was to have confirmatory crash data for our previous calculations of speed.  It was also our intentions [sic], at the time of my March 7, 2006, deposition to include some crash testing of a trailer equipped with a side underride guard to confirm our opinions that such a device would have prevented an underride.

(Docket Entry No. 138 at 3).  Contrary to this last statement, Enz had testified in his March 2006 deposition that he only intended to do two crash tests to verify speed.  When asked about the crash tests he planned, he said nothing about any test with a trailer modified to include a side underride guard.  Enz said nothing about any plan to produce a guard adaptable to the trailer involved in this accident.

Enz explained in his June 2006 affidavit that he and Karco (the crash testing company) had run into difficulties obtaining the correct trailer and deciding on the number of trailers needed for testing.  (*Id.* at 3).  Enz met with the fabricator of the side underride guard in "late March or early April"—after his deposition—and purchased some of the

component parts in late April 2006. (*Id.*). Production on the guard began on April 27, 2006. Enz stated that the first developmental test was completed on May 17, 2006 and the second on May 26, 2006. (*Id.*).[3]  The side underride guard was not installed on a Great Dane trailer until June 4, 2006, almost three months after Enz had been deposed. (*Id.* at 4).  Defendants note that the plaintiffs have failed to produce any of Enz's designs and that Enz failed to mention any of these plans at his deposition. (*But see* Docket Entry No. 139, Ex. 1 at 304–05 (Enz, in his deposition testimony, affirmatively responds when defense counsel asked if they had discussed "everything [Enz has] reviewed, everything you've created in terms of work product, everything you're relying upon to support your opinions and the full scope of those opinions")).

## II.      The Applicable Legal Standard

Federal Rule of Civil Procedure 16(b) authorizes federal courts to control and expedite the discovery process through a scheduling order.  "Consistent with the authority vested in the trial court by rule 16, our court gives the trial court broad discretion to preserve the integrity and the purpose of the pretrial order."  *Barrett v. Atl. Richfield Co.*, 95 F.3d 375, 380 (5th Cir. 1996) (quoting *Geiserman v. MacDonald*, 893 F.2d 787, 790 (5th Cir. 1990)).

Rule 26(a)(2)(B) requires all parties to designate witnesses and submit written reports drafted by the experts.  "The report shall contain a complete statement of all opinions to be

---

[3] Enz testified that the first test was "delayed due to the Easter weekend."  Easter occurred on April 16, 2006.  It is hard to decide what Enz intended with this statement, however; if he meant that the first test took place on April 17, 2006 (and not May 17), the rest of the dates are incorrect because the side underride guard, according to the rest of his testimony, was not even under construction until April 27, 2006.  The Easter qualification is disregarded as erroneous in light of the remaining chronology.

expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years." FED. R. CIV. P. 26(a)(2)(B).

Rule 26(e)(2) provides:

> A party who has made a disclosure under subdivision (a) or responded to a request for discovery with a disclosure or response is under a duty to supplement or correct the disclosure or response to include information thereafter acquired if ordered by the court or in the following circumstances . . . . (2) A party is under a duty seasonably to amend a prior response to an interrogatory, request for production, or request for admission if the party learns that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.

FED. R. CIV. P. 26(e)(2).

Parties that run afoul of Rules 16(b) and 26(e) are subject to sanctions under Rule 37 of the Federal Rules of Civil Procedure.  Rule 37(b)(2)(B) authorizes the district court to impose sanctions on a disobedient party by refusing to allow that party to introduce designated matters into evidence.  *Barrett*, 95 F.3d at 380 (citing FED. R. CIV. P. 37(b)(2)(B)).  "Possible sanctions for a violation of Rule 26(a)(2)(B)'s disclosure requirements include exclusion of the undisclosed information." *103 Investors I, L.P. v. Square Co.*, 372 F.3d 1213, 1217 (10th Cir. 2004) (citing FED. R. CIV. P. 37(c)).  In

reviewing sanctions orders, the Fifth Circuit looks to the following four factors: (1) the explanation, if any, for the party's failure to comply with the discovery order; (2) the prejudice to the opposing party of allowing the witnesses to testify; (3) the possibility of curing such prejudice by granting a continuance; and (4) the importance of the witnesses' testimony. *Tex. A&M Res. Found. v. Magna Transp., Inc.*, 338 F.3d 394, 402 (5th Cir. 2003) (citing *United States v. $9,041,598.68*, 163 F.3d 238, 252 (5th Cir. 1998)).

Rule 37(c)(1) provides in pertinent part that "[a] party [who] without substantial justification fails to . . . amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." FED. R .CIV. P. 37(c)(1).  To avoid sanctions, the party who is alleged to have failed to comply with Rules 16 and 26 bears the burden to show that its actions were substantially justified or harmless.  *Parrish v. Freightliner, L.L.C.*, No. 3:03-cv-817-J-32MCR, 2006 WL 1169694, *5 (M.D. Fla. May 3, 2006) (citing *Stallworth v. E-Z Serve Convenience Stores*, 199 F.R.D. 366, 368 (M.D. Ala. 2001)); *see also Link v. Wabash R.R. Co.*, 370 U.S. 626, 632–33 (1962) (recognizing recognized a court's inherent power to impose sanctions, including dismissal, in response to abusive litigation practices); *Mingo v. Sugar Cane Growers Co-op of Fla.*, 864 F.2d 101, 102 (11th Cir. 1989) (permitting, as incident to this inherent power, a judge may impose formal sanctions upon dilatory litigants).

**III.    Analysis**

Plaintiffs' proposed crash test involving a Great Dane trailer modified to include a specially-designed side underride guard represents a significant change in the basis for their liability theory. The theory that the trailer was defective because it lacked either elevation or a side underride guard is not new. But instead of supporting this theory using designs previously proposed, built, or tested by others, plaintiffs now propose to present evidence that their experts have designed and built a side underride guard adaptable for this trailer and that their experts have tested the guard using the vehicle involved in this accident. All through their reports and depositions, plaintiffs' experts stated their intent to rely on existing side underride guard designs and prior tests on those designs. After repeated delays in conducting any tests at all and no mention of any side underride guard design or testing protocol from a single expert witness, plaintiffs would severely prejudice the defendants by now presenting evidence of a new design for a side underride guard and tests of a Great Dane trailer modified to include it colliding with the car driven by plaintiffs' deceased.

In their reports and depositions, plaintiffs' experts did not rely on any such crash test data and testified they did not feel any need to do so. In January 2006, plaintiffs specifically asked for and received this court's permission to extend the expert report deadlines for the purpose of conducting crash testing before one expert issued his report and was deposed. Plaintiffs then failed to comply with those deadlines. That expert was able to issue his report with no need for the crash test data. Based on this court's review of the deposition testimony that has been submitted, plaintiffs largely failed to comply with this court's orders to produce

the information and documents on which their experts relied in formulating their opinions *before* the supplemental reports issued and the depositions took place.

Plaintiffs' expert Enz testified in his March 2006 deposition that he had ordered two crash tests, neither involving a modified trailer with a side underride guard added. Tomassoni testified in his deposition that he only "thought that it might be a good idea to at least kick around the idea of having Enz do some side underride tests representing this particular accident case using the vehicle in question and possibly a trailer in question." (Docket Entry No. 138 at 63–64).  Tomassoni obviously had not done so at that time. Tomassoni had, however, participated in another case involving an automobile crash with a Great Dane trailer, the "D'Orazio case," and produced some of his data from that case at his deposition.  (Docket Entry No. 139 at 9).  Sances, whom the plaintiffs claimed would not even submit an expert report until he could conduct crash testing, disavowed in his deposition any intention of performing a crash test or needing that data.  Enz, in his June 2006 affidavit, stated that he had planned on designing and producing a guard since January 2006.  Yet it was not until April 2006 that Enz actually designed the side underride guard that he now proposes to test; not until May 2006 that he actually purchased the materials for the guard; and not until early June 2006 that he obtained the guard for installation on a trailer.  Neither his report nor his deposition refers to any plan to design or build, much less test, a side underride guard and put it on the type of Great Dane trailer involved in this accident.  Enz stated in his June 2006 affidavit that when he was deposed in March 2006, he intended to crash a modified trailer equipped with a side underride guard.  Yet at his deposition, he had

20

not arranged for any such test and when asked about tests, identified two *other* tests that he intended to do.  This conduct flies in the face of plaintiffs' obligations under Rule 26 and this court's orders to inform defendants of the bases for the plaintiffs' experts' opinions before they were deposed.  It appears that after eighteen months of litigation and extensive discovery, plaintiffs now want to start over and develop a new evidentiary basis to support one or more of their liability theories.  This violates Rules 16 and 26 and this court's orders.

"Discovery is not a game of 'blind man's bluff.' " *Dollar v. Long Mfg. N.C., Inc.*, 561 F.2d 613, 616 (5th Cir. 1977) (additional citations omitted).  "Simply because a party has been sued under a theory in another lawsuit in another jurisdiction does not mean that party must be prepared in all other cases to defend that theory on a moment's notice." *Parrish*, 2006 WL 1169694, at *7.  In *Parrish*, a somewhat analogous products liability case, the court struck the plaintiff's expert testimony as a sanction for the plaintiff's failure to comply with the court's scheduling order and attempt to change its theory and testing models late in the discovery process. *Id.* at *6–*8.  Other litigants have had portions of their experts' testimony struck for failing to disclose the full extent of the testimony in the Rule 26 expert report.  In *Jones v. Flowserve FCD Corp.,* 73 Fed. Appx. 706 (5th Cir. 2003), the Fifth Circuit held that the district court did not abuse its discretion in striking three design defect theories alleged by the plaintiff's expert for the first time in affidavit testimony during summary judgment proceedings; none of the new theories had been part of the expert's Rule 26 report.  *Id.* at 709.  Other district courts appropriately strike such testimony when a party attempts to introduce it later in the case, after the expert reports have been submitted and depositions

have occurred.  *See, e.g.*, *Beasley v. U.S. Welding Serv., Inc.*, 129 Fed. Appx. 901, 902 (5th Cir. 2005); *Barrett*, 95 F.3d at 380; *Heidtman v. County of El Paso*, 171 F.3d 1038, 1040 (5th Cir. 1999); *Standard Servs. Co., Inc. v. Witex USA, Inc.*, No. Civ.A. 02-537, 2003 WL 2004442, *3 (E.D. La. Apr. 30, 2003); *Browning v. City of Balch Springs*, No. CIV. A.3:96-CV-1411P, 1997 WL 361632, *2–*3 (N.D. Tex. June 20, 1997).  District courts may even strike late testimony that provides more specific support for a general proposition that the party had already disclosed.  *Cf. Labelle v. Phillip Morris Inc.*, 243 F. Supp. 2d 508, 521 (D.S.C. 2001) ("While this [expert] affidavit, in effect, expresses an opinion regarding the causation of the decedent's lung cancer, an area disclosed in Plaintiff's expert identification, the specifics of this opinion appear for the first time eight months after the close of discovery. Further, after reviewing the record, it appears that aside from the documents noted above and the deposition testimony taken in other cases, the palladium catalyst issue was not raised or explored throughout this litigation until this latest round of motions on the eve of trial."). The advisory committee notes explain that, "Revised Rule 37(c)(1) provides an incentive for full disclosure; namely, that a party will not ordinarily be permitted to use on direct examination any expert testimony not so disclosed. . . . the report, which is intended to set forth the substance of the direct examination, should be written in a manner that reflects the testimony to be given by the witness and it must be signed by the witness."  FED. R. CIV. P. 26(a)(2) advisory committee's notes, 1993 amendments.

Even more troubling is that the plaintiffs' expert's work on a new design for a side underride guard and intent to crash test a trailer modified to include it was either so late in

the case that it was not disclosed in the expert reports and depositions or it was concealed in those reports and depositions.  Enz testified in March 2006 about the crash tests he planned to conduct, but did not mention a test of a trailer modified to include a side underride guard. Enz testified in March about his opinions concerning a design for a side underride guard, but he did not mention any specific design or production work he intended to do.  In his June 2006 affidavit, Enz states that he had intended to do a crash test with a side underride guard *before* his deposition and had intended to design and produce a guard for that purpose *before* his deposition.  (Docket Entry No. 138).  His deposition does not mention any such intent and is inconsistent with his affidavit.  Enz's affidavit also makes it clear that he did not begin to build or plan to test the side underride guard until well after his report and deposition. Neither Tomassoni nor Sances testified about any specific new side underride guard design or a plan to crash test it.  Either Enz concealed his plans for this work in his report and depositions, or the work was so late that it was not included in his report and is inconsistent with his affidavit.  Either alternative is a ground for excluding plaintiffs' experts from testifying about this work.

The extent of the prejudice to defendants is critical.  Arranging the additional test itself would require significant additional time.  Once the tests are finished, new reports from the plaintiffs' experts would be required.  Defendants would have to redepose at least Enz, Sances, Tomassoni, and any other proffered expert who could rely on the crash test results. Plaintiffs' counsel's offer to pay "reasonable" costs of such additional discovery is likely to lead to litigation over what is reasonable.  The offer does not acknowledge that defendants

would not only have to redepose plaintiffs' primary experts, but also require defendants to readjust all their own experts' work, an expense not covered by plaintiffs' offer.  Given the time required for discovery to date, allowing this additional evidence would likely delay this case for a significant period.  The defendants have devoted substantial energy and resources to defending this case based on the plaintiffs' original theories on alternative design, which, according to their experts' reports and depositions, rested on existing tests and literature. Allowing the plaintiffs to "restart" the case, apparently in search of better or more persuasive evidence of alternative design after plaintiffs' experts on design and causation have been deposed, would be unfair and prejudicial over and above any costs that could be assessed to the plaintiffs.

Additional delay in the form of a continuance would compound rather than solve the problem—this court has given repeated extensions to the plaintiffs to finish the crash testing, to provide the defendants with expert reports in compliance with the rules, and to permit the defendants to test the expert testimony through cross-examination.  Given the complex issues that introduction of a plaintiff-constructed side underride guard would inject at this stage, any continuance would have to be lengthy.  The delay is in itself a cost and a burden.  *Cf. Standard Srvs. Co., Inc.*, 2003 WL 2004442, at *3 (refusing to grant a third continuance and noting that "a continuance would only reward [the violating party] for its noncompliance with the scheduling order").

Finally, this court examines the prejudice to plaintiffs if this evidence is excluded. This sanction does not significantly impair plaintiffs' case, according to the plaintiffs'

counsel and experts.  This court is not striking all of plaintiffs' expert testimony.  Unlike those cases in which plaintiffs' experts were struck across-the-board or significant areas of their testimony was excluded, this court merely requires the plaintiffs to move forward with the significant body of evidence and expert testimony that they have already developed.  *Cf. Barrett*, 95 F.3d at 381 (affirming district court's sanction of striking experts, which practically ensured that the defendants would prevail on summary judgment); *Browning*, 1997 WL 361632, at *5 (striking critical expert testimony and noting that "[t]he Fifth Circuit . . . has repeatedly rejected such arguments of unfair prejudice").

This court is permitting the crash testing that the plaintiffs' expert Enz testified about in his deposition, notwithstanding the fact that plaintiffs failed to conduct even this testing in a timely manner.  Plaintiffs will have ample facts and expert opinions to make their case.  Plaintiffs' counsel conceded in hearings before this court that he did not need the additional crash tests using a trailer modified to include a side underride guard.  Plaintiffs' experts have also stated in their depositions that the additional crash testing is unnecessary to their opinions.  (*See* Docket Entry No. 137, unnumbered Ex. 1 at 202 (Enz's Dep.), unnumbered Ex. 2 at 30 (Sances's Dep.), unnumbered Ex. 4 at 63–64 (Tomassoni's Dep.), unnumbered Ex. 6 at 14 (Head's Dep.), unnumbered Ex. 7 at 68–75 (Schlosser's Dep.)).  Moreover, from the outset of this case, plaintiffs have had access to, and have disclosed, Tomassoni's records relating to designs for side underride guards used on Great Dane trailers developed in other cases.

Under the governing standards, imposing sanctions is appropriate. *See, e.g.*, *Tex. A&M Res. Found. v. Magna Transp., Inc.*, 338 F.3d 394, 402 (5th Cir. 2003). Plaintiffs' explanation for their failure to comply with this court's discovery and scheduling orders is unsatisfactory. The initial reason that this court permitted a delay in production of expert designation and reports was for Sances to conduct crash testing. In Sances's deposition, he disavowed any desire to conduct such testing, deferring to Enz. Enz failed to conduct any crash testing before he gave his report or before his deposition. He did not even contact a crash testing company until the week before his deposition and when he was deposed, and described only two crash tests he intended to conduct—neither involving a trailer modified to include a side underride guard. All of this took place after plaintiffs had already received an extension from the defendants voluntarily and an extension by this court over the defendants' objections.[4]

In summary, to allow evidence of crash tests conducted using a Great Dane trailer modified to include a side underride guard that plaintiffs' experts developed and built for this case, after the plaintiffs' experts have issued reports and been deposed, would significantly change the basis for a theory of liability and would cause significant delay and expense that a limited continuance and some cost-shifting could not remedy. The failure timely to disclose the proposed tests violated Rule 16, 26, and this court's orders.

---

[4] In his June 2006 affidavit, Enz claimed that his plans for receiving Tomassoni's information on side underride guards retrofitted to Great Dane trailers from other cases were thwarted, causing him to delay making his own design. As noted above, this testimony is contradicted by the record, which in fact shows that the plaintiffs have had access to these records.

**IV.    Conclusion**

Defendants' motion to enforce this court's previous orders is granted.  Plaintiffs are precluded from presenting expert testimony about crash testing conducted in this case using a trailer modified to include a side underride guard.  The two crash tests to which the parties have already agreed will take place on June 20, 2006, as planned.  The existing scheduling order remains in effect.

SIGNED on June 15, 2006, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge